### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

EMMANUEL RAMOS,
     *Plaintiff*,

    v.

CITY OF HARTFORD,
     *Defendant.*

No. 3:21-cv-01343 (VAB)

### RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Captain Emmanuel Ramos ("Captain Ramos" or "Plaintiff") has sued his employer, the City of Hartford (the "City" or "Defendant"), asserting claims for employment discrimination under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Connecticut Fair Employment Practices Act ("CFEPA"). Second Am. Compl., ECF No. 23 ("SAC").

Defendant has filed a motion for summary judgment. Mot. for Summ. J., ECF No. 53 (Jan. 30, 2024) ("Mot.").

For the following reasons, Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's federal claims.

The Court declines to exercise supplemental jurisdiction over the remaining state law claims and **DISMISSES** those claims without prejudice to refiling in Connecticut Superior Court.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

    A.  **Factual Background[1]**

On August 9, 1999, Captain Ramos—a Hispanic male—began work with the City of Hartford Fire Department (the "Department") as a firefighter. SAC at 2 ¶ 6[2]; Opp'n, Ramos Dep., Vol. I, Ex. A at 25:9–26:8, ECF No. 58-2 (Mar. 26, 2024) ("Ramos Dep., Vol. I, Ex. A"). In 2018, the Department promoted him to the rank of captain in the fire marshal's office. *Id*. at 34:10–17. At the same time of his promotion, Brian Kennedy—a Black male—received a promotion to the rank of captain in the fire marshal's office. *Id*. at 35:18–22; Opp'n, Kennedy Dep., Ex. B, at 17:3–7, ECF No. 58-2 (Mar. 26, 2024) ("Kennedy Dep., Ex. B").

At that time, the fire marshal for the City was Deputy Chief Ewan Sheriff—also a black male. Ramos Vol. I, Ex. A, at 45:24–46:8; Opp'n, Sheriff Dep., Ex. C at 8:15–21, ECF No. 58-2 (Mar. 26, 2024) ("Sheriff Dep., Ex. C"). As the fire marshal and a deputy chief, Deputy Chief Sheriff was the immediate supervisor to Captain Ramos. Sheriff Dep., Ex. C at 17:3–18:22.

Assistant Chief Daniel Reilly—a White male—was the assistant chief of support services, which included the fire marshal's office, and thus supervised Deputy Chief Sheriff. Opp'n, Reilly Dep., Ex. D at 20:19–20, 28:10–30:6, ECF No. 58-2 (Mar. 26, 2024) ("Reilly Dep., Ex. D"). From 2016 to May of 2021, the Chief of the department was Reginald Freeman— a Black male. Opp'n, Freeman Dep., Ex. E at 9:7–11:14, ECF No. 58-2 (Mar. 26, 2024) ("Freeman Dep., Ex. E"). From September of 2021 to the present day, Rodney Barco—a Black male—serves as the current fire chief, and before that assignment, served as the Assistant Chief

---

[1] The following facts are taken from the Complaint, the parties' Local Rule 56(a) statements, and related documents. The facts are presented in the light most favorable to Plaintiff as the non-moving party.
[2] Because Captain Ramos's Second Amended Complaint does not use consecutive numbering, the Court will cite to the Second Amended Complaint using both page and paragraph numbers.

of Operations under Chief Freeman. Opp'n, Barco Dep., Ex. F at 10:12–11:17, 27:19–28:1, ECF No. 58-2 (Mar. 26, 2024) ("Barco Dep., Ex. F").

The fire marshal's office begins each day with a roll call to check on staff, ensure that they are in proper uniform, determine whether they have any needs to be addressed, and to convey information and requests for inspection. Sheriff Dep., Ex. C at 56:9–57:3. At roll call, Deputy Chief Sheriff takes attendance, also known as "accountability," and notifies the Chief of anyone who is not present. Sheriff Dep., Ex. C at 59:19–23. Employees who are more than thirty minutes late without giving prior notice, even if they have an excuse, can be considered absent without leave. Freeman Dep., Ex. E at 80:5–9; Reilly Dep., Ex. D at 49:24–50:3, 54:17–21.

On February 3, 2020, Deputy Chief Sheriff sent the following e-mail to the fire marshal's office personnel: "Everyone will report at 0700 hours Monday through Friday. Staff meeting and roll call will be at 7:15 AM and ALL are expected to attend. Anyone that has not reported by 7:30 AM will be reported as AWOL." SAC ¶ 11(b); Mem., Ex. A to Ex. 8, Sheriff Decl., ECF No. 53-3 (Jan. 30, 2024) ("Sheriff Decl.").

Ten days later, Deputy Chief Sheriff submitted a fire service—an internal complaint—claiming that Captain Ramos was absent without leave. Sheriff Decl., Ex. B; Reilly Dep., Ex. D at 9:24–50:3. Subsequently, Chief Freeman asked Assistant Chief Reilly to look into this fire service, Mem., Reilly Decl. ¶ 7, ECF No. 53-3 (Jan. 30, 2024) ("Reilly Decl."), and Assistant Chief Reilly found that Deputy Chief Sheriff did not lie about the incidents. Reilly Decl. ¶ 8.

In April 2020, Captain Ramos exchanged e-mails with Chief Freeman expressing dissatisfaction that a meeting was scheduled to take place in person. Ramos Dep., Vol. I, Ex. A at 185:3–186:3; Mem., Ex. 13. Captain Ramos's e-mails included: "WE NEED TO TAKE THIS VIRUS A LITTLE MORE SERIOUS" and "Take caution in your tone chief as your message is

full of assumptions and is coming across as very aggressive." Ramos Dep., Vol. I, Ex. A at 185:3–186:3; Mem., Ex. 13.

Chief Freeman interpreted this e-mail, and another from the same exchange, to be insubordination. Pl.'s Response to Def.'s SMF ¶ 64, ECF No. 58-1 (Mar. 26, 2024) ("Pl.'s SMF"); Freeman Dep., Ex. E at 49:7–13.

On September 24, 2020, Captain Ramos joined a staff meeting remotely. Pl.'s SMF ¶ 69. Because Captain Kennedy had already joined the meeting, and only one representative from the fire marshal's office was needed, then-Assistant Chief Barco asked Captain Ramos to leave the staff meeting. *Id*. ¶¶ 69–70; Ramos Dep., Vol. II, Ex. J at 24:13–25, 29:9–13, 32:4–6, ECF No. 58-2 (Mar. 26, 2024) ("Ramos Dep., Vol. II, Ex. J"). Captain Ramos alleges that his dismissal was due to race because Captain Kennedy has never been dismissed. Ramos Dep., Vol. II, Ex. J at 32:7–13. Chief Freeman was present at this meeting, *id*. at 27:1–3, and Captain Ramos sent an e-mail to Chief Freeman alleging that Captain Ramos was dismissed from the meeting "out of spite since [he] inquired about multiple questionable decisions by the third floor." *Id*. at 34:21–35:17, 51:22–52:2.

On October 6, 2020, Chief Freeman held a *Loudermill* hearing[3] against Captain Ramos for insubordination and Chief Freeman, finding Captain Ramos guilty, issued a written warning. Mem., Ex. 17, ECF No. 53-3 (Jan. 30, 2024). The written warning was later reduced to counseling. Mem., Ex. 18; Ramos Dep., Vol. II, Ex. J at 81:1-20.

---

[3] "Generally speaking, a *Loudermill* hearing is a pre-disciplinary procedure to determine 'whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Sullivan v. Cossette*, No. 3:13-CV-621 (SRU), 2013 WL 3965125, at *1 (D. Conn. Aug. 2, 2013) (quoting *Cleveland Bd. Of Ed. V. Loudermill*, 470 U.S. 532, 545–46 (1985)).

On October 20, 2021, Chief Barco held a *Loudermill* hearing against Captain Ramos for insubordination and Chief Barco, finding Captain Ramos guilty, issued a three-day suspension. Mem., Barco Decl., Ex. 14, ECF No. 53-3 (Jan. 30, 2024).

On or about March 14, 2022, Captain Ramos's suspension was reduced to counseling through the grievance process and, as a result, he was restored the three days' pay and the suspension letter was removed from his personnel file. Barco Dep., Ex. F at 58:2-3; Ramos Dep., Vol. II, Ex. J at 76:17-23, 81:1-20; Reilly Decl. ¶ 17.

From September 1, 2020, through November 19, 2020, Deputy Chief Sheriff was out on medical leave and Captain Kennedy served as the acting fire marshal. Kennedy Dep., Ex. B at 21:11–21; Ramos Dep., Vol. I, Ex. A at 155:15-20; Reilly Decl. ¶ 13. Deputy Chief Sheriff and Captain Kennedy both work Tuesday through Friday ("B Tour"). Pl.'s SMF ¶ 55. Captain Ramos works Monday through Thursday ("A Tour"). *Id*. Captain Kennedy is senior to Captain Ramos because he scored higher on the captain's exam. Barco Dep., Ex. F at 38:8-18; Ramos Dep., Vol. I, Ex. A at 165:3-10. Acting fire marshal, however, is not a promotion. Ramos Dep., Vol. II, Ex. J at 14:20-15:8.

Captain Ramos alleges that he did not have the opportunity to perform the duties of a fire marshal in an acting capacity. Pl.'s SMF ¶ 56.

### B.  Procedural History

On October 11, 2021, Captain Ramos filed his Complaint in this Court. Compl., ECF No. 1 (Oct. 11, 2021).

On November 24, 2021, Captain Ramos filed a motion to amend his Complaint with Defendant's consent, First Mot. to Amend, ECF No. 12 (Nov. 24, 2021), which the Court

granted, Order Granting Mot. to Amend, ECF No. 13 (Nov. 26, 2021), and Captain Ramos filed his First Amended Complaint, First Am. Compl., ECF No. 14 (Dec. 3, 2021).

On December 17, 2021, the Court entered a scheduling order based on the parties' Rule 26(f) Report. Scheduling Order, ECF No. 16 (Dec. 17, 2021); Rule 26(f) Report, ECF No. 15 (Dec. 15, 2021).

On January 11, 2022, the City of Hartford filed its Answer to Captain Ramos's First Amended Complaint. Answer, ECF No. 18 (Jan. 11, 2022).

On July 21, 2022, Captain Ramos filed a second motion to amend with Defendant's consent, Second Mot. to Amend, ECF No. 21 (July 21, 2022), which the Court granted, Order Granting Second Mot. to Amend, ECF No. 13 (July 22, 2022), and Captain Ramos filed his Second Amended Complaint, SAC.

On January 30, 2024, the City of Hartford filed its motion for summary judgment. Mot.; Mem. in Supp. of Mot. for Summ. J., ECF No. 53-1 ("Mem.").

On March 26, 2024, Captain Ramos filed his opposition to the City of Hartford's motion for summary judgment. Pl.'s Opp'n to Summ. J., ECF No. 58 ("Opp'n").

On May 7, 2024, the City of Hartford filed a reply in support of its motion for summary judgment. Reply in Supp. of Def.'s Mot. for Summ. J., ECF No. 63 ("Reply").

On August 1, 2024, the Court held oral argument on the pending summary judgment motion. ECF No. 73.

On August 5, 2024, Captain Ramos filed a supplemental memorandum of law notifying the Court of the Connecticut Supreme Court's August 1, 2024 decision in *O'Reggio v. Comm'n on Hum. Rts. & Opportunities*, No. SC 20847, 2024 WL 3628003 (Conn. 2024).[4]

---

[4] *O'Reggio* answers "the question of who qualifies as a 'supervisor' and renders an employer vicariously liable for

## II.     STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some

---

the creation of a hostile work environment under CFEPA. 2024 WL 3628003, at *1. Because the Court does not reach Captain Ramos's state law claims, the Court need not consider this additional authority.

unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (first citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967) and then citing *First Nat'l Bank of Ariz. V. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.


## III.    DISCUSSION

In his Second Amended Complaint, against the City of Hartford, Captain Ramos brings a discrimination claim under the Equal Protection Clause, discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), and discrimination and retaliation claims under the Connecticut Fair Employment Practices Act ("CFEPA").

8

The Court will address each claim against the City of Hartford, beginning with the federal claims.

### A.  The Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment protects public employees from race discrimination and retaliation for complaining about race discrimination. *See Vega v. Hempstead Union Free Sch. Dist*, 801 F.3d 72, 82 (2d Cir. 2015). Public employees may bring discrimination and retaliation claims under 42 U.S.C. § 1983 against "responsible persons acting under color of state law." *Id.* at 87.

Under § 1983, a local government is responsible only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658, 694 (1978).

#### 1.  Final Policymaking Authority

"[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988); *see also Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) ("The matter of whether the official is a final policymaker under state law is 'to be resolved by the trial judge before the case is submitted to the jury.'" (quoting *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989))).

"Moreover, the challenged actions must be within that official's area of policymaking authority." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008). "[T]he court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Id*.

Defendant, relying on *Monell*, argues that Captain Ramos cannot raise a genuine issue of material fact as to whether municipal policy or custom caused his injury because Chiefs Freeman and Barco are not final policymakers within the meaning of § 1983. Mem. at 16–19. Defendant also argues that, even if Captain Ramos could raise a genuine issue of material fact as to the existence of such a policy or custom, his § 1983 claim would still fail because there is nothing in the record to support his claim of disparate treatment based on race. *Id*. at 19–24.

Captain Ramos argues that because he repeatedly appealed to the City's human resources department for recourse to no avail, human resources—allegedly the entity responsible for making and enforcing Hartford City personnel policies—endorsed and supported the acts of the Chief, and thus establishing a policy by a final policymaker or deliberate indifference by supervisory officials. Opp'n at 5–7.

In response, Defendant notes that Captain Ramos does not refute that Chiefs Freeman and Barco are not final policymakers and argues that human resources is not a final policymaker either. Reply at 1–2.

The Court agrees, in part.

The challenged actions relevant to Captain Ramos's § 1983 claim are his allegations that "Chief Barco, Reilly, and Freeman acted and engaged in discriminatory practices that prevented people who identify as Hispanic from being promoted and therefore being fully represented in the workplace and community, unfairly enforce[ed] the disciplinary policies of Hispanic employees while not enforcing the same standards when non-Hispanic employees engage in the same misconduct, and otherwise treat[ed] them differently from non-African American employees such that they were discriminated against due to their protected class as Latino." SAC at 9 ¶ 13. Thus, the relevant inquiry is whether Chiefs Barco, Freeman, or Assistant Chief Reilly

have final policymaking authority with respect to promotions, disciplinary actions, or with respect to the alleged custom or policy responsible for the alleged treatment of Latino employees of the Department.

First, Assistant Chief Reilly is the assistant chief of support services—he is not the current or former fire chief. Pl.'s SMF ¶ 8. Captain Ramos points to nothing in the record indicating that assistant chiefs have any policymaking authority, and thus Assistant Chief Reilly is not a final policymaker within the meaning of § 1983.

Second, as to Chiefs Barco and Freeman, the current and former fire chief respectively, Pl.'s SMF ¶¶ 10–11, this question has been answered, in part, in this District. In *Looby v. City of Hartford*, 152 F. Supp. 2d 181 (2001), the District Court determined that the Hartford Fire Department's fire chief did not have final policymaking authority regarding hiring and promotion decisions. *Id*. at 189. Distinguishing the authority to exercise discretion from policymaking authority, the court there found that the City charter granted the fire chief authority to exercise discretion in making hiring and promotion decisions but did not delegate to the Chief the authority to make employment policy. *Id*. at 188–89 ("[N]owhere in the Charter is the Fire Chief given any power to create policy with respect to employment decisions. . . . [A] grant of discretion is not equivalent to policymaking authority, and plaintiff has failed to show anything more than Dobson's authority to exercise discretion in making hiring and promotion decisions."); *see also Chin v. New York City Hous. Auth.*, 575 F. Supp. 2d 554, 562 (S.D.N.Y. 2008) ("The critical characteristic of final policymakers when employment is at issue is whether the municipal official has authority to formulate the rules governing personnel decisions rather than authority to make decisions pursuant to those rules—e.g., the hiring and firing of subordinates." (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 n.12 (1986) (plurality

opinion))).

Since *Looby*, courts in this Circuit have agreed that "the authority to make individual employment decisions was not sufficient to make an official a policymaker for the purposes of *Monell* liability. *Baity v. Kralik*, 51 F. Supp. 3d 414, 439–40 (S.D.N.Y. 2014) (citing *Hardy v. Town of Greenwich*, No. 06–CV–833, 2009 WL 2176117, at *6 (D.Conn. July 22, 2009) (holding that, "while [the chief of police] certainly enjoyed discretion to decide which employees to appoint to specialized units," that discretion was constrained by the town's policies and the oversight of the [police commissioner] and that the [c]hief of [p]olice was therefore not the final policymaker for the claims at issue); *Chin v. N.Y.C. Hous. Auth.*, 575 F. Supp. 2d 554, 565–66 (S.D.N.Y. 2008) (finding that the plaintiff's supervisor was not a final policymaker regarding employment practices where the city charter vested that authority elsewhere and the supervisor's discretion was constrained by municipal policy); *Albert v. City of Hartford*, 529 F. Supp. 2d 311, 330–31 (D. Conn. 2007) (holding that the police chief was not the final policymaker as to the hiring and firing of employees where his discretion was constrained by city policies, including an anti-discrimination policy); *Knight v. Hartford Police Dep't*, No. 04–CV–969, 2006 WL 1438649, at *20 (D. Conn. May 22, 2006) (granting summary judgment to the defendants on grounds that the police chief was not a policymaker because his "powers to appoint or remove— including his power to make promotions—are expressly made 'subject to' the antidiscrimination provisions of Chapter XVI. In contrast to this grant of discretion with respect to employment decisions, the [p]olice [c]hief is given authority to make rules and regulations—in conformity with city ordinances—concerning the operation of the department and the conduct of its employees."). The same logic applies here.

The City's charter outlines the authority of a fire chief as follows:

> The head of the department shall be the fire chief who shall be in
> direct command of the fire department and shall be responsible for
> the operation of the department consistent with the policy directives
> of the mayor. . . . Subject to the personnel and civil service
> provisions of this Charter and ordinances, the chief shall appoint and
> remove all other officers and employees of the department. The
> chief shall assign all members of the department to their respective
> posts, shifts, details and duties and shall make rules and regulations
> in conformity with the ordinances of the city concerning the
> operation of the department and the conduct of all officers and
> employees thereof. The chief shall be responsible for the efficiency,
> discipline and good conduct of the department and for the care and
> custody of all property used by the department. Disobedience to the
> lawful orders of the chief or to the rules and regulations aforesaid
> shall be ground for dismissal or for other appropriate disciplinary
> action taken in accordance with the personnel and civil service
> provisions of this Charter and ordinances. The chief shall have
> further power to make regulations with the force of law,
> implementing and giving effect to the laws and ordinances relating
> to fire prevention and fire safety.

Mem., Ex. 22 at 376, ECF No. 53-3 (Jan. 30, 2024) ("City Charter, Ex. 22"). Under this

language, the fire chief has the authority to make employment decisions pertaining to

appointment, removal, and assignments, and the fire chief is responsible for discipline. But this

provision does not grant the fire chief final policymaking authority over those matters. *See id.*

("the fire chief who shall be in direct command of the fire department and shall be responsible

for the operation of the department consistent with the policy directives of the mayor. . . .").

Further, the charter expressly grants the City of Hartford's council the authority to

establish ordinances that address promotions within the civil service system:

> The council, upon recommendation of the mayor, shall establish
> ordinances that address the areas of (i) qualifications and
> competitive examinations for entry level and promotional
> appointments (encouraging, as far as practicable, the promotion
> from lower classes of city employees): (ii) creation and maintenance
> of eligible lists, certification of the same and the standards of
> appointment thereunder; [and] (iii) standards of dealing with
> temporary appointments . . . .

*Id*. at 380.

Thus, in the absence of any contrary statutory language or other evidence that Chiefs Barco and Freeman had anything more than the discretion to make promotional and disciplinary decisions, they did not have final policymaking authority over those matters within the meaning of § 1983.

As the District Court in *Looby* and *Knight* noted, however, the charter does grant the fire chief the "authority to make rules and regulations concerning the operation of the department, the conduct of its employees and giving effect to laws relating to fire prevention and safety." *Looby*, 152 F. Supp. 2d at 188; *Knight*, 2006 WL 1438649, at *20; *see also* City Charter, Ex. 22 at 376 ("The chief . . . shall make rules and regulations in conformity with the ordinances of the city concerning the operation of the department and the conduct of all officers and employees thereof."); Mem., Barco Dep., Ex. F at 60:15–19, ECF No. 53-53 (Jan. 30, 2024) ("Barco Dep., Ex. F") ("Q  Chief, earlier in your deposition you were asked some questions about your abilities, and you had testified that you had the ability to make policies and procedures in the fire department. Did I understand that correctly?  A  Yes.").

Captain Ramos alleges that, in addition to promotions and discipline, Latino employees were generally treated differently than other employees. SAC at 9 ¶ 13. And given that the fire chiefs have the authority to make rules and regulations concerning the operation of the department and the conduct of their employees, the fire chiefs have "authority to formulate the rules governing" the challenged conduct, "rather than authority to make decisions pursuant to those rules." *Chin*, 575 F. Supp. 2d at 562. Thus, Chiefs Barco and Freeman did have policymaking authority with respect to the alleged custom or policy responsible for the alleged conduct against Latino employees of the Department.

Relying on *Jones v. Town of E. Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("A municipal policymaking official's 'deliberate indifference' to the unconstitutional actions, or risk of unconstitutional actions, of municipal employees can in certain circumstances satisfy the test for a municipal custom, policy, or usage that is actionable under Section 1983." (citing *Amnesty Am. V. Town of W. Hartford*, 361 F.3d 113, 126, 127 n.8 (2d Cir. 2004)), Captain Ramos further argues that the human resources department is the final policymaker through which the town is liable under § 1983. Opp'n at 7. Captain Ramos cites to Hartford Code § 2-332(B), *id*., which states:

> (B) [*Responsibilities*.] As provided in the Charter of the City, Chapter VIII Section 5(e), the Human Resources Department shall be solely responsible for all personnel matters relating to the classified service and shall perform all personnel functions for all city departments including but not limited to the following functions:
> a) Recruitment and testing;
> b) Job description, classification and compensation;
> c) Administration of employee benefits, for both active employees and retirees, contract negotiations and contract interpretation; and
> d) Arbitration, grievances, complaints and all employment discrimination actions.

Mem., Hartford Municipal Code, Ex. 23 at 386, ECF No. 53-3 (Jan. 30, 2024) ("Municipal Code, Ex. 23"). And regarding the human resources department, the charter states that "[i]n order to advance the purposes of this Charter, the council, upon recommendation of the mayor, shall enact ordinances relating to the operation of the department and the civil service system." City Charter, Ex. 22 at 379. It also states that the "director shall be responsible for the efficiency, discipline and good conduct of the department." *Id*. at 380.

But, as explained above, this language does not indicate that the human resources department or director has final policymaking authority with regard to the conduct Captain

Ramos challenges. Indeed, the charter expressly vests policymaking authority in the City of Hartford's council. Thus, the human resources department or director is not a final policymaker within the meaning of § 1983.

Accordingly, because the human resources department and Assistant Chief Reilly are not final policymakers under § 1983, and because Chiefs Freeman and Barco are not final policymakers regarding promotions and discipline, the Court will proceed only with its discussion of whether Chiefs Freeman or Barco ordered or ratified the alleged policy, practice, or custom responsible for the alleged conduct against Latino employees of the Department.

### 2.  Municipal Policy, Practice, or Custom

A municipality is only subject to liability under § 1983 when the violation of the plaintiff's federally protected right is attributable to the enforcement or execution of a municipal policy, practice, or custom. *See Monell*, 436 U.S. at 694 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996). A municipality also may be liable for acts that "were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses." *Jones*, 691 F.3d at 81 (2d Cir. 2012) (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125–26 (2d Cir. 2004).

Thus, "[a] plaintiff alleging that []he has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ordered or ratified the employee's actions—either expressly or tacitly." *Id*. (citing *Amnesty Am*, 361 F.3d at 126; *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (a municipality's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution" (citation and internal quotation marks omitted)). In other words, "a plaintiff can prevail against a municipality by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them." *Jones*, 691 F.3d at 81. Specifically, "a 'custom or policy' may be inferred from evidence that a municipal entity 'had notice of but failed to make any meaningful investigation into charges of misconduct by lower-level employees.'" *Doe ex rel. Doe v. Darien Bd. of Educ.*, 110 F. Supp. 3d 386, 409 (D. Conn. 2015) (citing *Doe v. City of New York*, No. 09 CIV. 9895 (SAS), 2013 WL 796014, at *3 (S.D.N.Y. Mar. 4, 2013) *aff'd*, 558 F. Appx. 75 (2d Cir. 2014)).

Although Chiefs Barco and Freeman had policymaking authority with respect to the alleged policy, practice, or custom responsible for the alleged conduct against Latino employees of the Department, the City of Hartford argues that Captain Ramos's Complaint does not contain any facts establishing the requisite policy, practice, or custom. Mem. at 17.

In response, Captain Ramos argues that a final policymaker[5] acquiesced to "consistent

---

[5] Specifically, Captain Ramos argues that human resources acquiesced to the fire department's alleged harassment and targeting of Hispanic employees. Opp'n at 7. Because the Court has determined that Chiefs Barco and Freeman—and not human resources—had final policymaking authority with regard to the operation of the department and the conduct of their employees, the Court will determine whether there is a factual dispute as to whether Chiefs Barco or Freeman were aware of the alleged treatment of Hispanic employees and whether they chose to ignore it. *See Jones*, 691 F.3d at 81 ("[A] plaintiff can prevail against a municipality by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them.").

harassment and targeting of Hispanic employees, including Captain Ramos." Opp'n at 7. Captain Ramos argues that this alleged indifference to the operations of the fire department evidences a policy of said harassment. *Id*.

The Court disagrees.

Captain Ramos alleges that he has been injured by the alleged conduct against Hispanic employees in the following ways[6]: (1) Assistant Chief Reilly treated Captain Ramos differently than Deputy Chief Sheriff regarding their "earned days," *id*. at 15; (2) then-Assistant Chief Barco dismissed Captain Ramos from a meeting and did not dismiss Captain Kennedy, *id*. at 17–18; (3) Deputy Chief Sheriff swore at Hispanic employees but not at non-Hispanic employees, *id*. at 18; and (4) the City allegedly posted a sign concerning facial hair and depicted an allegedly stereotypical Hispanic male with a "fu mancu [sic] mustache" as "unacceptable facial hair," *id*. at 18.

First, Captain Ramos testified that he informed Deputy Chief Sheriff that one of his earned days needed to be changed to a sick day due to a directive or policy that requires employees overdue on their physical to take a sick day. Opp'n, Ramos Dep., Vol. I, Ex. A at 137:5–8, ECF No. 58-2 (Mar. 26, 2024) ("Ramos Dep., Vol. I, Ex. A"). Captain Ramos testified that he asked Deputy Chief Sheriff to use a vacation day for the same reason, and when Deputy Chief Sheriff required Captain Ramos to take a sick day instead, Captain Ramos informed Assistant Chief Reilly and Chief Freeman. *Id*. at 138:17–141:12. Assistant Chief Reilly allegedly informed Captained Ramos that Deputy Chief Sheriff was allowed report the day as an earned day. *Id*. at 144:6–13. Assistant Chief Reilly testified that Captain Ramos asked him to change Captain Ramos's sick day into an earned day, which Assistant Chief Reilly refused because it

---

[6] Captain Ramos also alleges additional conduct not related to himself. Those allegations are discussed below in the context of Captain Ramos's hostile work environment claim.

was already recorded, and payroll and human resources allegedly does not allow changes. Opp'n, Reilly Dep., Ex. D, ECF No. 58-2 (Mar. 26, 2024) ("Reilly Dep., Ex. D"). But Captain Ramos does not point to any evidence that he reported this conduct to anyone as harassment or as being related to him being Hispanic.

Second, Captain Ramos testified that, on September 24, 2020, then-Assistant Chief Barco asked him to leave a staff meeting because of his race or ethnicity. Ramos Dep., Vol. II, Ex. J at 24:13–25, 29:9–13, 32:4–6. Captain Ramos testified that, in his view, his dismissal was due to race because Captain Kennedy, a Black employee, had never been dismissed. *Id*. at 32:7–13. Captain Ramos testified that Chief Freeman was present at this meeting, *id*. at 27:1–3, and that he sent an e-mail to Chief Freeman alleging that Captain Ramos was dismissed from the meeting "out of spite since [he] inquired about multiple questionable decisions by the third floor[,]" *id*. at 34:21–35:17, 51:22–52:2, however, Captain Ramos maintained in his testimony that his treatment was due to his race, *id*. at 52:3–9.

Again, Captain Ramos does not point to any evidence that he reported this conduct to anyone as harassment due to him being Hispanic. Indeed, he reported that it was "out of spite since [he] inquired about multiple questionable decisions by the third floor." *Id*. at 51:22–52:2.

Third, Captain Ramos testified that Deputy Chief Sheriff has sworn at him and other Hispanic employees, but he had never heard Deputy Chief Sheriff swear at non-Hispanic employees. Ramos Dep., Vol. II, Ex. J at 140:4–144:15. Captain Ramos testified that he reported Deputy Chief Sheriff allegedly swearing at him to Assistant Chief Reilly but did not report Deputy Chief Sheriff allegedly swearing only at Hispanic employees, nor did he allege to Assistant Chief Reilly that the alleged cursing was due to race. *Id*. at 169:1–16. Notably, Captain Ramos does not point to any testimony that he reported Deputy Chief Sheriff allegedly swearing

at only Hispanic employees to the fire chief, or that the fire chief was independently aware of this.

Fourth, Captain Ramos alleges that the City of Hartford posted a sign depicting a stereotypical Hispanic male with a Fu Manchu mustache (misspelled fu mancu) as an example of unacceptable facial hair. Pl.'s Add'l Material Facts ¶ 32, ECF No. 58-1 (Mar. 26, 2024) ("Pl.'s Add'l Facts"); Opp'n, Ex. T at 1104, ECF No. 58-2 (Mar. 26, 2024) ("Opp'n, Ex. T"). Captain Ramos does not allege that he reported this sign or that Chiefs Freeman or Barco otherwise knew about this sign. Chief Barco testified that he was unaware of the sign allegedly posted in the fire department. Opp'n, Ex. F at 20:2–11, ECF No. 58-2 (Mar. 26, 2024) ("Barco Dep., Ex. F").

Thus, Captain Ramos has not raised any factual dispute as to whether Chiefs Freeman or Barco were aware of any alleged constitutional deprivations or otherwise unlawful actions by subordinates. Although "[t]he issue of authorization, approval or encouragement is generally one of fact, not law[,]" *Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir. 1980), Captain Ramos has not pointed to any facts suggesting that Chief Freeman or Barco had "knowledge of a pattern of constitutionally offensive acts by their subordinates but fail[ed] to take remedial steps," *id*.

And although Captain Ramos has not pointed to any evidence that Chiefs Freeman or Barco were aware of any of the conduct that Captain Ramos now identifies as racial harassment, he did testify that he contacted human resources at least five times regarding alleged harassment. Ramos Dep., Vol. II, Ex. J at 122:4–18.

The record contains two reports of investigations into Captain Ramos's allegation of disparate treatment against Hispanic employees. Mem., Lombardi Decl., Ex. B to Ex. 20, ECF No. 53-3 (Jan. 30, 2024) ("Chinni Report"); *Id*., Lombardi Decl., Ex. C to Ex. 20, ECF No. 53-3 (Jan. 30, 2024) ("Dixon Report").

The conclusion of the report by Attorney Christine L. Chinni dated March 26, 2021, and concerning a complaint filed by Captain Ramos was as follows:

> After reviewing the allegations in the complaint filed by Fire Captain Ramos as well as that filed by Lt. Cosme, I determined that the majority of the allegations in both complaints did not allege any violations of the law, such as harassment or equal employment opportunity. Additionally, neither complaint alleged a violation of the Code of Conduct in effect for the fire department. Rather, both complaints primarily took issue with management decisions, with which the complainants disagreed. Such complaints are not actionable, and do not warrant a full investigation.

Chinni Report at 340–41. And the report by Attorney Jennifer L. Dixon dated April 11, 2022, and concerning a complaint filed by Captain Ramos read:

> Based on this investigation, it is clear that Captain Ramos takes issue with the leadership and many management decisions in the HFD. Captain Ramos' allegations, however, do not constitute a claim of a hostile work environment due to his race or a claim of retaliation in violation of the law or City policies.

Dixon Report at 365.

Captain Ramos asserts that the Chinni report should not be considered because it is inadmissible and because the investigation was superficial. Opp'n at 6. Although Captain Ramos does not cite to any record evidence to support the contention that the investigation was superficial, *see Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (determining that the plaintiff failed to establish deliberate indifference where the evidence "established that the Town actually held a work session, and did hire an attorney to investigate [the plaintiff's] allegations" and where finding nothing in the record to support the assertion that "this was done merely to placate him and give the appearance to the public that they took his complaints seriously"), the Court need not consider the contents of the report to determine that there is no dispute as to whether an investigation occurred in light of the deposition testimony establishing that at least

one did occur. *See* Reilly Dep., Ex. D at 99:21–24 ("Q Do you know if any investigations were done regarding his allegations of disparate treatment towards Hispanics? A  Just the one that was sent over to HR."); Ramos Dep., Vol. II, Ex. J at 13:4–19 ("Q. Do you recall being interviewed by either Christine Cheney [sic] or a Jennifer Dixon? A. I'm sorry, yes. Jennifer -- Jennifer Lee Ann Dixon I believe her name is. . . . I believe she was gathering information for the claims of -- of being -- . . . harassed.").

In light of the absence of evidence that the fire chiefs were aware of any race-based harassment related to the conduct Captain Ramos identified, *see Gerte v. Borough of Naugatuck*, No. 3:19-CV-1511 (JBA), 2021 WL 1165362, at *7 (D. Conn. Mar. 26, 2021) (noting that "alleging a pervasive practice amongst lower-level municipal employees alone is insufficient to state a *Monell* claim under § 1983" and that a plaintiff must also allege "that 'the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the action'" (quoting *Amnesty America*, 361 F.3d at 126)), and in light of the investigations conducted following conduct that Captain Ramos did report as racial harassment, *see Manville v. Town of Greece*, 892 F. Supp. 2d 469, 477 (W.D.N.Y. 2012) ("Visconte's complaint cannot, in itself, supply a basis for *Monell* liability in this case, because the Town *did* take action in response to that complaint."), Captain Ramos has failed to raise a genuine issue of material fact as to whether Chiefs Freeman or Barco were deliberately indifferent to unconstitutional or otherwise unlawful actions, and thus as to whether the City could be liable under § 1983, *see Bruker v. City of New York*, 337 F. Supp. 2d 539, 556 (S.D.N.Y. 2004) (granting summary judgment on a *Monell* claim and finding that the plaintiff "offered no evidence that any of the actions of which she complain[ed] occurred under the auspices of an official policy" where she "failed to proffer any evidence of an informal custom which was

tolerated or tacitly endorsed by those in charge" and where the alleged conduct was "not so obviously incorrect that [the Commissioner] should have been immediately aware that [the plaintiff's] rights were being violated").

Accordingly, the Court will grant Defendant's motion for summary judgment as to Captain Ramos's Equal Protection claim.

### B. The Title VII Claims[7]

Title VII prohibits an employer from discriminating in "compensation, terms, conditions, or privileges of employment, because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment . . . ,' which includes requiring people to work in a discriminatorily hostile or abusive environment." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (citation omitted).

#### 1. The Hostile Work Environment Claim

To establish a hostile work environment under Title VII, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *see also Brittell v. Dep't of Corr.*, 247 Conn. 148, 166–67 (1998) ("To establish a claim of hostile work environment [under CFEPA], 'the workplace [must be] permeated with discriminatory intimidation, ridicule, and

---

[7] Although the standards governing CFEPA employment discrimination claims are the same as those governing Title VII. *See Martinez v. Conn. State Libr.*, 817 F. Supp. 2d 28, 55 (D. Conn. 2011) (collecting cases); *see also, e.g.*, *Craine v. Trinity Coll.*, 259 Conn. 625, 637 n.6 (2002) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both." (citation omitted)), the Court will address only the Title VII claims here.

insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"). "In determining whether a plaintiff suffered a hostile work environment, [courts] must consider the totality of the circumstances." *Littlejohn*, 795 F.3d at 321.

A court ruling on a motion for summary judgment "may not properly focus on individual strands of evidence and consider the record in piecemeal fashion; rather, it must consider all of the evidence in the record, reviewing the record taken as a whole." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012) (internal citations and quotation marks omitted). "[W]hen the same individuals engage in some harassment that is explicitly discriminatory and some that is not, the entire course of conduct is relevant to a hostile work environment claim." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 388 (2d Cir. 2020).

Defendant argues that the instances of allegedly discriminatory behavior that Captain Ramos identifies are both unrelated to race and are not sufficiently severe or pervasive enough to establish a hostile work environment. Mem. at 25–26.

In response, Captain Ramos argues that the record establishes that all of the alleged instances of misconduct, in the aggregate, are probative of a hostile work environment. Opp'n at 10–11.

The Court will address each argument in turn.

### i. Because of Race

To establish a hostile work environment claim, "[a] plaintiff must . . . demonstrate that []he was subjected to the hostility because of h[is] membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999). The plaintiff can make such a showing "by alleging facts that directly show discrimination or facts that indirectly show

discrimination by giving rise to a plausible inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). An inference of discrimination can be shown by "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted).

Defendant argues that there is no evidence that any of the identified incidents were motivated by racial animus. Mem. at 26.

Captain Ramos does not respond to this argument.

The Court agrees with Defendant.

In addition to the alleged conduct outlined above, Captain Ramos alleges that the following conduct contributed to a hostile work environment: (1) Captain Ramos reported Deputy Chief Sheriff, who is Black, for forgery and the investigation lasted twelve hours and was memorialized in less than a page in comparison to the investigation and twenty-three-page report of claims made by Lieutenant Quinonez, who is Black, that Captain Ramos was harassing her, Opp'n at 12–13; (2) Deputy Chief Sheriff made false allegations that Captain Ramos was absent without leave and Captain Ramos was investigated, however, Deputy Chief Sheriff was not investigated when Captain Ramos reported him as absent without leave, *id*. at 14; (3) Captain Kennedy, who is Black, was chosen over Captain Ramos to serve as the acting fire marshal twice, *id*. at 15–16; (4) the City hired a Black candidate allegedly with reports of policy violations and disciplinary issues as a cadet over a Hispanic candidate, *id*. at 18; (5) Black employees who were late to work were not disciplined, but Hispanic employees who were late to work were at least counseled, *id*.; (6) human resources refused to issue discipline sought by

25

Chief Freeman against Shelly Carter, who is Black, for allegedly lying about an on-duty motor vehicle accident, *id*.; (7) when Rory Wentworth, who is White, asked Chief Freeman about the difference between the discipline he was receiving compared to another employee, Chief Freeman allegedly responded by referring to race, *id*. at 19; and (8) Captain Ramos was disciplined twice, once by Chief Freeman and once by Chief Barco, *id*. at 19–21.

Of these allegations, Black employees allegedly being treated more favorably when late, Chief Freeman's comment to Mr. Wentworth, Deputy Chief Sheriff's allegedly selective use of profanity at Hispanic employees, and the allegedly stereotypical depiction of a Hispanic man with facial hair deemed unacceptable may be sufficient to give rise to a plausible inference of discrimination, and thus any factual disputes regarding these allegations may be sufficient to survive summary judgment.[8]

As to an allegation that Lieutenant Rivera, who is Hispanic, was counseled was counseled for tardiness when Lieutenant Carter, who is Black, was not, Lieutenant Cosme testified that he does not know whether Lieutenant Rivera was disciplined or just coached. Opp'n, Cosme Dep., Ex. O at 116:21–25, ECF No. 58-2 (Mar. 26, 2024) ("Cosme Dep., Ex. O") ("Q  Okay. Now counseling, did you mean counseling in terms of like discipline or just a coaching? A  I'm not sure. I wasn't in the office, you'll have to ask Olga."). He also testified that his basis for believing that Lieutenant Carter had not been disciplined was because it continued to happen. *Id*. at 119:13–120:5, 122:3–6 ("Q  So what makes you believe that all of Carter's purported hour late to work was never otherwise excused[?] . . . [A]  Whenever she was late [Deputy Chief Sheriff] would come in, where is Carter? Where is Carter? . . . And that indicated

---

[8] The other allegations Captain Ramos raised may be considered in the totality of the hostile work environment, however, because they are facially race-neutral and Captain Ramos—outside of his bare allegation that they are race related—does not point to any record evidence giving rise to a plausible inference of discrimination in relation to those allegations, they do not weigh into the analysis of whether the alleged hostility was on account of race.

to us that it was constantly happening. . . . Q  Your basis for believing she has never been -- well, at least disciplined is because you never seen evidence of suspension? A  Yes.").

Captain Ramos testified that Captain Kennedy was regularly late and was never written up, but Lieutenant Pereira was written up for being late. Ramos Dep., Vol II, Ex. J at 153:15–17 ("Lieutenant Pereira was written up for being late. And Captain Kennedy was late regularly, never was he written up."). Other than stating that it was blatantly obvious, Captain Ramos did not testify as to how he knew that Captain Kennedy was never disciplined and Lieutenant Pereira was. Indeed, Captain Ramos testified that if a Lieutenant was running late, he may not know if they had already notified a supervisor that they were running late, *id*. at 135:18–21 ("Q. Okay. And if one of them was arriving late, though, you may not always know if they had notified Captain Kennedy or Chief Sheriff; is that fair to say? A. Correct."), and could not recall one specific instance of a Lieutenant not being disciplined for arriving late without notifying any supervisor, *id*. at 136:4–13 ("Q. Okay. Are you aware of any times that a Lieutenant arrived late technically without notifying any supervisor in the Fire Marshal's Office, but was not disciplined? A. Yes. It's happened before plenty of times. Q. Can you recall a specific instance? A. Not a specific one. But I do know that plenty of times whoever was conducting a special might come in and they'll -- and they'll ask: Where were you? Oh, I was conducting this test or that test.").

Unsupported allegations that Black employees were never counseled or disciplined for tardiness while Hispanic employees were counseled or disciplined for tardiness is insufficient to create a genuine dispute of material fact. *See Goenaga v. March of Dimes Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) ("[T]he plaintiff cannot meet this burden through reliance on unsupported

27

assertions. . . . [T]he nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor.").

As to Chief Freeman's allegedly race-related comment, Assistant Chief Reilly was read the allegation that Chief Freeman said "[t]he difference is I am black and the other employee is black, good luck with that." Reilly Dep., Ex. D at 109:18–19. Assistant Chief Reilly testified that he did not recall Chief Freeman saying that. *Id*. at 109:24–110: 1 ("A  I -- I don't recall that statement being made. But I know there was a disagreement on -- that was taken in the wrong context but race-related, yes."). Assistant Chief Reilly also testified that "Chief Freeman simply stated that the circumstances in both cases were entirely different and that there was no real relation one way or the other to race." *Id*. at 110:10–13.

Chief Barco also testified that Chief Freeman's statement, as written in the Second Amended Complaint, is an inaccurate recollection of the statement. Barco Dep., Ex. F at 47:19–48:5 ("Q . . . . I want to look at 11.o for a second. Were you present at this meeting where allegedly Chief Freeman said the statement as quoted here that 'the difference is I am Black and the other employee is Black, good luck with that,' when referring to given different treatment? A  Yes. Q . . . . [I]s that statement accurate to the best of your recollection, what is said there? A  Negative. No."). Chief Barco testified that he could not recall what was said word for word but did remember the context of the conversation, and that Chief Freeman did not even know that the other employee being referenced was Black. *Id*. at 48:6–7, 50:9–12 ("Q  Can you describe for me what was said? A  I can't in -- like word for word, but I know the context of the conversation. . . .").

And finally, Chief Freeman does not recall making the statement at all. Opp'n, Freeman Dep., Ex. E at 68:23–24, ECF No. 58-2 (Mar. 26, 2024) ("Freeman Dep., Ex. E") ("Q. Do you recall making a statement to that effect? A. I have no clue what they're talking about.").

At oral argument, Captain Ramos, through counsel, argued that Rory Wentworth could testify that Chief Freeman said, "the difference is I am black and Jason Southerland is black, good luck with that[,]" Opp'n, Ex. U, ECF No. 58-2 (Mar. 26, 2024) ("Opp'n, Ex. U"), and thus avoid the hearsay within hearsay problem created by mere reliance on the e-mail[9] with this content.[10] *See Rodriguez v. Mod. Handling Equip. of NJ, Inc.*, 604 F. Supp. 2d 612, 622 (S.D.N.Y. 2009) ("Double hearsay is not admissible unless each level of hearsay is covered by an exception to the hearsay rule." (quoting *Agriculture Ins. Co., Inc. v. Ace Hardware Corp.*, 214 F.Supp.2d 413, 416 (S.D.N.Y. 2002))); *see also Perry v. City of Stamford*, 996 F. Supp. 2d 74, 80 (D. Conn. 2014) ("The Second Circuit has clearly stated that 'only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'" (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997))). Nevertheless, in the absence of any evidence in the record of racially disparate treatment with respect to discipline meted out by Chief Freeman, most specifically any differences in discipline contemporaneous with that statement, or any other action taken by him, this statement does not constitute admissible evidence because it has little to no probative value, and to the extent that it does, any such value is outweighed by its potentially prejudicial effects for the purpose of establishing Captain Ramos's hostile work environment

---

[9] Captain Ramos testified that he only learned of this allegation through an e-mail. Ramos Dep., Vol. II at 60:5–6, 61:2–4 (" Q. . . . How did you learn of this incident? A. I got a copy of the Fire Service. . . . Q. . . . Is that the Fire Service that you're referencing there, is it that email from Wentworth to Reilly? A. I believe so."). Captain Ramos testified that "most likely [he] would have asked" Mr. Wentworth about the allegation but has no specific recollection of discussing this allegation with Mr. Wentworth. Id. at 65:25–66:7.

[10] "While evidence produced by the party opposing a summary judgment motion need not be 'in a form that would be admissible at trial,' 'its content must nonetheless be admissible[.]'" *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 675–76 (S.D.N.Y. 2012) (internal citations omitted).

claim. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is

substantially outweighed by a danger of one or more of the following: unfair prejudice,

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting

cumulative evidence."); *see also Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 150 (2d Cir. 2010)

(holding that the district court acted within its discretion when it excluded evidence under Rule

403 where "testimony relating to the [allegedly discriminatory] remarks would have been, at

best, only marginally relevant").

 As to the poster of acceptable and unacceptable facial hair, other than testimony from

Chief Barco that he was unaware of the sign allegedly posted in the fire department, Barco Dep.,

Ex. F at 20:2–11 ("Q Well, if I were to tell you that this is a sign posted in the fire department,

would that surprise you? A  Yes. In the Hartford Fire Department? Q  Yes. A  Yup. Yes, it

would."), Captain Ramos does not point to any testimony or other record evidence of where this

sign is posted, who posted it, or that he has even seen it. The sign itself is in the record and it

depicts two examples of acceptable facial hair—clean shaven and narrow mustache—and six

examples of unacceptable facial hair—full beard, beard, goatee, Fu Manchu mustache, wide

mustache, and one indiscernible style. Opp'n, Ex. T at 1104. Each style has an associated

illustration appearing to be of a variety of races or ethnicities, and the depiction of a beard

appears to be an illustration of Abraham Lincoln. On this record, without any testimony or other

evidence that Captain Ramos was aware of this sign, the sign in and of itself—or, in conjunction

with any other evidence in this record—does not create a genuine issue of fact as to Captain

Ramos's hostile work environment claim. *Cf. Varughese v. Mount Sinai Med. Ctr.*, No. 12 CIV.

8812 (CM) (JCF), 2015 WL 1499618, at *61 (S.D.N.Y. Mar. 27, 2015), *aff'd*, 693 F. Appx. 41

(2d Cir. 2017) ("[T]o rely on discriminatory comments in pursuit of a hostile work environment claim, a plaintiff must at least have been generally *aware* that such comments were uttered.").

As to Deputy Chief Sheriff's allegedly selective use of profanity at Hispanic employees, Captain Ramos testified that Deputy Chief Sheriff has cursed at Captain Ramos, his brother Miguel Ramos, and Lieutenant Cosme, Ramos Dep., Vol. II at 140:5–19 ("A. Well, he cursed at me before. He cursed at my brother before. He cursed at Ralph -- Lieutenant Cosme . . . . [and] Louis Garcia . . . ."), and that he does not recall ever hearing Deputy Chief Sheriff swear or curse at Black or other non-Hispanic employees in the fire marshal's office, *id*. at 144:8–15. 143:20–22. In Captain Ramos's view, Deputy Sheriff cursed exclusively at Hispanic employees.

But Captain Ramos testified that Deputy Chief Sheriff created a hostile work environment for everyone. Opp'n, Ramos Dep., Vol. I, Ex. A at 109:19–24, ECF No. 58-2 (Mar. 26, 2024) ("Ramos Dep., Vol. I, Ex. A") ("Q. Okay. And was it your opinion that he was creating a hostile work environment for everyone in the office? A. For multiple people, yes, sir. Q. Well, everyone or multiple people? A. I would say everyone with his actions."). As a result, without more—other than Captain Ramos's testimony alone—to establish that Deputy Chief Sheriff directed profanity only at Hispanic employees, Captain Ramos's testimony only stands for the proposition of what he witnessed, not what the Deputy Chief Sheriff exclusively does. *Cf. DeAngelis v. City of Bridgeport*, No. 3:14-cv-01618 (JAM), 2017 WL 3880762, at *7 (D. Conn. Sept. 5, 2017) ("The testimony of several employees that the City's supervisors behaved in a verbally abusive, hostile manner toward women and not toward men could allow a reasonable jury to conclude that plaintiff was exposed to the hostile work environment she describes because of her gender."). It does not create a genuine issue of fact as to "more favorable treatment of employees not in the protected group[] or the sequence of events leading to the

[adverse employment action]," *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted)),

which can be evidence of discriminatory motivations.

Accordingly, in the absence of a genuine issue of material fact as to whether he was

subject to hostility because of his race,[11] Captain Ramos does not have a viable hostile work

environment claim.

### ii.  Severe or Pervasive

Even though there is not a genuine issue of material fact as to whether any alleged

hostility in the workplace was due to Captain Ramos's race, the Court nonetheless also will

examine whether any alleged hostility in this workplace is severe or pervasive because Title VII

"does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa*

*Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale v. Sundowner Offshore Services,*

*Inc.*, 523 U.S. 75, 80 (1998)). To establish a hostile work environment under Title VII, a plaintiff

must also show that "the workplace is permeated with discriminatory intimidation, ridicule, and

insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment." *Harris*, 510 U.S. at 21 (citations and internal

quotation marks omitted).

"This standard has both objective and subjective components: the conduct complained of

must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and

---

[11] At oral argument, Captain Ramos—through counsel—argued that his allegations could be tied to race through Lieutenant Cosme's allegation that he has heard racial slurs used against Hispanics in the Department. *See* Cosme Dep., Ex. O at 95:20–96:4. This, however, is insufficient as Captain Ramos has "[n]ever overheard anyone employed by the Hartford Fire Department use derogatory terms for Hispanics or Latinos[,]" Ramos Dep., Vol. II, Ex. J at 87:3–5, *see Tillman v. Luray's Travel*, 137 F. Supp. 3d 315, 335 (E.D.N.Y. 2015) ("Indeed, Tillman admits that he never overheard any racially disparaging comments being made at Luray."), nor does he point to any record evidence that he otherwise had knowledge of such. *See Equal Emp. Opportunity Comm'n v. United Health Programs of America, Inc.*, 14-CV-3673 (KAM) (JO), 2020 WL 1083771, at *5 (E.D.N.Y. March 6, 2020) ("[A]n individual plaintiff who experiences a hostile work environment need not be the target of other instances of hostility to support her claim if the plaintiff has knowledge of hostility directed at other employees . . . .").

the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (citing *Harris*, 510 U.S. at 21–22).

"The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (internal quotation marks omitted). In determining whether a plaintiff established there was a hostile work environment, courts must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Defendant argues that, even in the light most favorable to Captain Ramos, his alleged harassment consists of race neutral personnel and administrative actions and falls short of severe and pervasive harassment that may alter the terms and conditions of employment. Mem. at 33–34.

The Court agrees.

Again, Captain Ramos alleges that the following conduct contributed to a hostile work environment: (1) Captain Ramos reported Deputy Chief Sheriff, who is Black, for forgery and the investigation lasted twelve hours and was memorialized in less than a page in comparison to the investigation and twenty-three-page report of claims made by Lieutenant Quinonez, who is Black, that Captain Ramos was harassing her, Opp'n at 12–13; (2) on February 13, 2020, Deputy Chief Sheriff made false allegations that Captain Ramos was absent without leave and Captain Ramos was investigated, however, Deputy Chief Sheriff was not investigated when Captain Ramos reported him as absent without leave, *id*. at 14; (3) Captain Kennedy, who is Black, was chosen over Captain Ramos to serve as the acting fire marshal twice in 2020, *id*. at 15–16; (4) the

City hired a Black candidate allegedly with reports of policy violations and disciplinary issues as a cadet over a Hispanic candidate, *id*. At 18; (5) Black employees who were late to work were not disciplined, but Hispanic employees who were late to work were at least counseled, *id*.; (6) human resources refused to issue discipline sought by Chief Freeman against Shelly Carter, who is Black, for allegedly lying about an on-duty motor vehicle accident, *id*.; (7) in the summer of 2021, when Rory Wentworth, who is White, asked Chief Freeman about the difference between the discipline he was receiving compared to another employee, Chief Freeman allegedly responded by referring to race, *id*. at 19; (8) Captain Ramos was disciplined twice, once by Chief Freeman in October of 2020 and once by Chief Barco in October of 2021, *id*. at 19–21; (9) around March 2020, Assistant Chief Reilly treated Captain Ramos differently than Deputy Chief Sheriff regarding their "earned days," *id*. at 15; (10) on September 24, 2020, then-Assistant Chief Barco dismissed Captain Ramos from a meeting and did not dismiss Captain Kennedy, *id*. at 17–18; (11) Deputy Chief Sheriff swore at Hispanic employees but not at non-Hispanic employees, *id*. at 18; and (12) the City allegedly posted a sign concerning facial hair and depicted an allegedly stereotypical Hispanic male with a "fu mancu [sic] mustache" as "unacceptable facial hair," *id*. at 18.

First, the Court need not and will not consider the allegedly racially disparate discipline of tardy employees, Chief Freeman's alleged comment, Deputy Chief Sheriff's allegedly selective use of profanity, nor the sign depicting unacceptable facial hair to be a part of the alleged hostile work environment. While the Court must review the record "as a whole" and not "in piecemeal fashion[,]" *Lyons*, 681 F.3d at 57, as discussed above, there are no genuine issue of material facts in this record to support any of these allegations, at least for purposes of supporting a hostile work environment claim.

Considering the remaining allegations—which mostly pertain to Captain Ramos's disagreement with management decisions—taken as a whole, there are no facts from which a reasonable jury could conclude that the conduct Captain Ramos identified was severe or pervasive enough to have altered the conditions of his employment and created an abusive working environment. *See Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 673 (S.D.N.Y. 2012) (granting summary judgment on a hostile work environment claim and finding that "no reasonable juror could find that any of the incidents Plaintiff describe[d] were sufficiently severe to materially after Plaintiff's working conditions" where the plaintiff alleged that—over a four-year period—she was cursed at, yelled at, had paper thrown at her, her complaints to the Defendants were ignored, she was falsely accused of policy violations, she was overlooked for a promotion, she was verbally abused, and more); *Matthews v. Corning Inc.*, 77 F. Supp. 3d 275, 293 (W.D.N.Y. 2014) (granting summary judgment on a hostile work environment claim and finding that the plaintiff's allegations—that she was referred to as the "cleaning bitch," her project manager was rude to her and tried to portray her as a drug-user, a rumor was started that she had a crush on her project manager, she received harassing e-mails, and that her work was sabotaged—were neither severe enough nor pervasive enough to rise to the level of a hostile work environment).

Moreover, Captain Ramos alleges that "the first instance of differing treatment towards non-Hispanic employees [wa]s in 2017," Opp'n at 11, and alleges only seven other incidents through 2021. But episodic and isolated allegations are insufficient to raise a dispute as to the pervasiveness of an allegedly hostile work environment. See *Davis-Bell*, 851 F. Supp. 2d at 673 ("[T]he nine incidents that Plaintiff claims created her hostile work environment are episodic and

isolated, spread out over four years. They are not continuous enough to be considered 'pervasive' by a rational juror.").

Finally, and most significantly to Captain Ramos's hostile work environment claim, Captain Ramos points to no facts connecting any of his allegations of unfair treatment to any race-related allegation, as discussed above. *See Tillman v. Luray's Travel*, 137 F. Supp. 3d 315, 329 (E.D.N.Y. 2015) ("It is 'axiomatic' that in order to establish a claim of a hostile work environment, a plaintiff must link the hostile conduct to his or her protected class. (citing *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)); *see also Matthews*, 77 F. Supp.3d at 293 ("While actions that are neutral on their face can be considered in assessing the totality of the circumstances for a hostile work environment claim, there must be some circumstantial or other basis for inferring that [such] incidents were in fact discriminatory." (citation and internal quotation marks omitted)).

Accordingly, Captain Ramos has failed to create a genuine issue of fact as to his hostile work environment, and summary judgment will be granted as to this claim.

### 2. The Retaliation Claim

Title VII also makes it unlawful for an employer to discriminate against an employee because the employee has "opposed any practice made an unlawful employment practice . . . or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). "The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

"In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of *McDonnell Douglas Corp*." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). The plaintiff employee must first establish a prima facie case by showing: (1) the employee engaged in an activity protected by Title VII; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) a causal connection exists between the alleged adverse action and the protected activity. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citing *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)). "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (internal quotations omitted) (citing *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015); *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)). If a plaintiff satisfies this initial burden, "a presumption of retaliation arises." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citation omitted).

Next, "the employer must offer through the introduction of admissible evidence a legitimate nondiscriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *See McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (citing *Sista v. CDC Ixix N.A., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006). "The proper question for a retaliation claim is whether the alleged adverse action to which the plaintiff was subjected could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination."

*Davis-Garrett v. Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019) (citing *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). Finally, "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Defendant argues that, even if Captain Ramos could raise a triable issue of fact as to his engagement in protected activity, Captain Ramos cannot establish that he suffered an adverse employment action at all, let alone one connected to any alleged protected activity. Mem. at 35–36.

In response, Captain Ramos argues that Defendant engaged in "a consistent pattern of ostracizing and disciplining" Captain Ramos, sufficient to establish an adverse employment action. Opp'n at 26. Captain Ramos also argues that Defendant has failed to rebut any of his allegations of retaliation, and thus has not met its burden on summary judgment. *Id.* at 29.

The Court disagrees.

Assuming without deciding that Captain Ramos has engaged in a protected activity, the Court begins its analysis with whether Captain Ramos has suffered an adverse employment action.

"An adverse employment action is defined as a 'materially adverse change in the terms and conditions of employment.'" *Arnold v. Yale New Haven Hosp.*, 213 F. Supp. 2d 142, 151 (D. Conn. 2002) (quoting *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997)). "The Supreme Court [has] held that an adverse action in the retaliation context means 'the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Rodriquez-Coss v. Sessions*, No. 3:16-CV-00633 (VLB), 2018 WL 3213290, at *19 (D. Conn. June 29, 2018) (quoting *Burlington N. & Santa Fe R.R. Co.*

*v. White*, 548 U.S. 53, 57 (2006)); *see also Ellis v. Dep't of Developmental Servs.*, No. 3:17-CV-1766 (AWT), 2018 WL 8729587, at *6 (D. Conn. Aug. 22, 2018) ("Reprimands and excessive scrutiny do not constitute adverse employment actions." (citing *Plahutnik v. Daikin Am., Inc.*, 912 F. Supp. 2d 96, 103 (S.D.N.Y. 2012) and *Lucenti v. Potter*, 432 F. Supp. 2d 347, 364 (S.D.N.Y. 2006))).

Captain Ramos makes general assertions that he was punished and disciplined following his reports of harassment, but Captain Ramos only identifies three specific allegations: (1) the October 2020 written warning; (2) the October 2021 suspension; and (3) the investigation into allegations that Captain Ramos was absent without leave. Opp'n at 25–26.

Taking these matters in reverse order, the investigation, which did not result in disciplinary action, Ramos Dep., Vol. I, Ex. A at 102:7–9 ("Q. Okay. Now, you were never disciplined in any manner for this; right? A. No, not once I explained myself[.]"), was not an adverse employment action, *see Lewis v. Connecticut Dep't of Corr.*, 355 F. Supp. 2d 607, 619–20 (D. Conn. 2005) (granting summary judgment where the plaintiff's employment not materially altered in Title VII retaliation claim when "internal investigation did not conclude that [the plaintiff] was at fault, it did not result in any discipline against her, and it did not result in any reduction in her pay or benefits, either during or after the investigation").

Additionally, although a suspension without pay is an adverse employment action, *see McInnis v. Town of Weston*, 458 F. Supp. 2d 7, 13 (D. Conn. 2006) ("[I]t is undisputed that plaintiff's suspension without pay was an adverse employment action."), it is undisputed that Captain Ramos's warning and suspension were both reduced to counseling actions. Pl.'s SMF ¶ 77, 89; Ramos Dep., Vol. II, Ex. J at 76:22; *see also Bolden v. Potter*, No. 07-CV-785 (AWT), 2010 WL 1286756, at *8 (D. Conn. Mar. 29, 2010) ("Even taken together with the other

incidents of which she complains, this [suspension] fails to rise to the level of an adverse employment action, because it was reduced to a warning."); *Sanossian v. Valley Stream Cent. High Sch. Dist.*, No. CV-16-4697 (JMA) (AYS), 2022 WL 976814, at *13 (E.D.N.Y. Feb. 16, 2022), *report and recommendation adopted*, No. 16-CV-4697 (JMA) (ARL), 2022 WL 970807 (E.D.N.Y. Mar. 31, 2022) ("The prospective ramifications and subjective concern regarding the consequences of being issued a counseling memorandum, without supporting evidence, is insufficient to raise an issue of fact on whether the memorandum amounted to an adverse employment action.").

Although the Court recognizes the mosaic approach to establishing an adverse employment action, without Captain Ramos identifying anything in the record that demonstrates that being counseled twice created a materially adverse change in the terms and conditions of employment, he has failed to raise a factually dispute regarding such. *Cf. Colon v. City of New York*, No. 19 Civ. 10435 (PGG) (SLC), 2021 WL 4943552, at *19 (S.D.N.Y. Jan. 15, 2021), *report and recommendation adopted*, No. 19 Civ. 10435 (PGG) (SLC), 2021 WL 4427169 (S.D.N.Y. Sept. 26, 2021) (finding, on a motion to dismiss, that a promotion denial, functional demotion, disciplinary charge, and termination occurring in tandem with complaints "plausibly paint[ed] a mosaic of retaliation").

Accordingly, the Court will grant Defendant's motion for summary judgment as to Captain Ramos's retaliation claim.

### 3. The Disparate Treatment Claim

Whether brought under Title VII or the Equal Protection Clause, disparate treatment claims are analyzed under the burden shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019)

(CFEPA); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004)

(Equal Protection).

> Under the [*McDonnell Douglas*] test, a plaintiff must first establish
> a *prima facie* case of discrimination by showing that: (1) []he is a
> member of a protected class; (2) []he is qualified for h[is] position;
> (3) []he suffered an adverse employment action; and (4) the
> circumstances give rise to an inference of discrimination. Once a
> plaintiff has established a *prima facie* case, a presumption arises that
> more likely than not the adverse conduct was based on the
> consideration of impermissible factors. The burden then shifts to the
> employer to articulate some legitimate, nondiscriminatory reason
> for the disparate treatment. If the employer articulates such a reason
> for its actions, the burden shifts back to the plaintiff to prove that the
> employer's reason was in fact pretext for discrimination.

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 82–83 (2d Cir. 2015) (internal quotation

marks and citations omitted).

Defendant argues that Captain Ramos's disparate treatment claim fails at the first stage of

the *McDonnell Douglas* framework because he cannot establish an adverse employment action

or circumstances giving rise to an inference of discrimination. Mem. at 20. Defendant also

argues that any adverse employment actions prior to August 20, 2020, are untimely. *Id.* at n.12.

In response, Captain Ramos appears to argue that he is not bringing a disparate impact

claim. Opp'n at 29 ("[The City] attempts to conflate the standard for a hostile work environment

claim with discrete disparate impact claims, the former of which Mr. Ramos is alleging and

demonstrates facts supporting . . . .").

Accordingly, given Captain Ramos's concession, this case is not proceeding on a

disparate treatment theory under § 1983 or Title VII, and any such claim will be dismissed from

this case.

### C.  The Remaining State Law Claims

Having decided to dismiss Captain Ramos's federal claims, the Court must determine whether to exercise supplemental jurisdiction over Captain Ramos's state law claims. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" (quoting 28 U.S.C. § 1367(c)(3))); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Consistent with that analysis, the Court declines to exercise supplemental jurisdiction over Captain Ramos's state law claims. *See John v. All Star Limousine Serv., Ltd.*, No. 17-CV-6327 (PKC) (RLM), 2022 WL 36219, at *5 (E.D.N.Y. Jan. 4, 2022) ("The FLSA claim is the only federal cause of action in this case. Because the Court grants summary judgment as to that claim, it declines to exercise supplemental jurisdiction over Plaintiff's state law claims. The state law claims therefore are dismissed without prejudice to refiling in state court.").

Accordingly, the Court will dismiss the state law claims without prejudice to refiling in state court.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED** as to Plaintiff's federal claims.

The Court declines to exercise supplemental jurisdiction over the remaining state law claims and **DISMISSES** those claims without prejudice to refiling in Connecticut Superior Court.

The Clerk of Court is respectfully directed to enter judgment for the Defendant and to close this case.

**SO ORDERED** at New Haven, Connecticut, this 9th day of August, 2024.

 /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE